FILED
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
2004 AUG 13 P 1: 11

U.S. DISTRICT COURT
DISTRICT OF MASS

**ATTACHMENT 1**

**LOI TAN NGUYEN**
**Plaintiff**

V.

**NMT Medical, Inc.**
**Defendant**

**CIVIL ACTION**

**NO. _____**

## COMPLAINT

### Parties

1) The plaintiff is a resident of 92 Saint Marks Road, Dorchester, MA 02124 and a citizen of the United States.

2) The defendant NMT Medical Inc. is located at 27 Wormwood Street, Boston, MA 02210

### Jurisdiction

3) Plaintiff determines that the employer discriminated against plaintiff based on race (Asian) and national origin (Vietnamese) violating the Title VII of Civil Right Acts of 1964. The summarized proof for this determination as follows:

   a) The plaintiff is a member of the protected class (Vietnamese descent).
   b) According to the performance review, plaintiff's performance exceeds employer's expectation.
   c) The plaintiff was the only employee who has suffered from adverse employment actions including the followings:
      i) Employer instigated and excited a coworker, Mr. Kellywan Kan (Cambodian descent), to harass plaintiff severely and pervasively with profanities and intimidated coworker with sharp device.
      ii) Employer invaded plaintiff's privacy without plaintiff's permission,
      iii) Employer fabricated false accusations for the reasons to terminate plaintiff's employment.

**Facts**

4) Mr. Kan's harassment:
Mr. Kan was a R&D senior technician at NMT Medical prior to my arrival at NMT. His cubicle was situated next to mine, separated by a 5' tall board. My first impression of Mr. Kan was that of a quiet and religious person who seemed to enjoy an atmosphere where people did not frequently use profanity or talk too loudly. We quickly became friendly from my first day at NMT. We talked and respect each other space and privacy, but that lasted only for the first two days. His attitude toward our friendly relationship gradually changed. Occasionally, I began to hear Mr. Kan use profanities in his cubicle by himself. No one was around but me, I did not pay any attention to Mr. Kan because the manner of his voice and his tone did not indicate any hostility against anyone; this made me believe that he was just speaking to himself. From then on I heard Mr. Kan use profanities quite often, most of the time with no one around but me. About a month later, all of a sudden when we were approaching each other from opposite directions, he stared away in a manner to avoid my greetings. When I said "hi" to him on more than one occasion, he did not respond and began to avoid contact with me whenever he believed that I was trying to approach him. Consequentially we stopped talking to each other and our friendly relationship disappeared. As time went on, he became more aggressive and pervasive in using obscenities and directed his voice at my cubicle so as to draw my attention. The profanities he used mostly were "Shit", and later on even directed towards me, "shit...man, shit...man..." His changed attitude and behavior towards me caused me to pay closer attention and use more caution in my relations with Mr. Kan. It was then that I realized Mr. Kan was in fact directing his profanities at me, and that he only used this type of language when I was near by. Sometimes, he would come to his cubicle from his workstation just to yell profanities, without a doubt, towards me for about five minutes and go back to his workstation and work the rest of the day without using any profanity. Most of the time when Mr. Kan used profanities there would be no one around, but occasionally other workers (engineers, technician, co-op students) would be seated at the lab bench only about five yards away from my cubicle and could also hear the language Mr. Kan used towards me.

As each day passed I felt that my working environment was getting more hostile, as a result I wrote an email to Ms. Cara Hard (Human Resources manager) to report these incidents. The purpose of the email is to ask management to talk to Mr. Kan and stop him from using excessive profanities at work. The day after I sent the email I went to see Ms. Cara Hard in person and later Mr. Lee Core (my supervisor) about Kan's behavior and mentioned that Mr. Kan had been harassing me with obscenities. In addition, I also told Ms. Cara Hard and Mr. Lee Core that I suspected that Mr. Kan's actions were being instigated by someone within the department. In my conversation with

Ms. Cara Hard, she asked me whether Mr. Kan used my name when he used obscenities; my answered to this question was "No". She then proceeded to asked me that if Mr. Kan did not use my name when he said obscenities, why I think he was directing his profanity at me. I responded by telling her that the manner in which the profanities were spoken, the context in which the profanities were used (shit...man), and the location and time when Mr. Kan used these profanities led me to believe for certain that he was directing his profanities towards me.

About a week later, after our conversation, Ms. Cara Hard told me that she mentioned my complaint to Mr. Kan and that Mr. Kan had admitted that he did use profanities and that he has habit of swearing. Ms. Kara Hard said that there is nothing that could be done since it was his habit. I also met with Mr. Lee Core again about the incident. Two days later Mr. Lee came to me with the same response, stating, "It is Kan's habit of using profanities and currently there is nothing that I can do to stop him".

Despite my repeated complaints, Mr. Kan continually harassed me with foul language severely and pervasively until my last days at NMT. Although I periodically reported the harassment with Ms. Cara Hard twice and Mr. Lee Core on three occasions, the answer I received was always the same, "Mr. Kan has a habit of using profanity, currently there is nothing the company can do to stop him".

On one occasion, when we were both working in the same lab, Mr. Kan waved a caliper (a sharp device) in front of me with a threatening expressing in his face. A few hours later I overheard two co-op students (Mr. Phil and Derek) mentioned that Mr. Kan had tried to intimidate me with a caliper.

The last incident when Mr. Kan harassed me, I decided to talk to him. I told him to stop harassing and making fun of me. I did not yell at him nor did I threaten him in any way. I felt that there was no hope the problem would be resolved I decided to call the police to report the harassment. When Mr. Kan knew I was calling the police, he had gone home before the police officers arrived. I could only guess that the purpose of this was to avoid an interview with officers, so that the truth could be kept hidden. Mr. Lee told me that I should go home and that I should not come back until someone in the company telephoned me. Two days later, Mr. David (NMT Vise president) called me about the incident. Then, on 6/27 I got a letter of termination. The reasons for my discharge were misconduct and threatening a coworker. There were no details as to how I had threatened a fellow worker or as to how I had conducted myself in a way that deserved being terminated so abruptly.

In addition to the harassment, I am certain that my privacy had been invaded. I believe this to be true because on many occasions I overheard engineers in the department discuss or mention my personal information including but not

limited to the details of my school record, medical record, and daily activities. The gossip at lunchtime or informal conversations with coworkers were kept track of and reported to management.

## Argument

5) According to the facts above, it is clear that it was NMT intent not only to terminate my employment but also to inflict emotional distress and to ruin my career. I believe that the company's responsibility is to adhere to the law and take the immediate and appropriate corrective actions in an objective and professional manner to stop all the harassment in a manner timely at the work place. Despite my repeated and detailed complaints to management, the NMT was very negligent in failing to take the appropriate steps to stop the almost daily harassment that I was subject to. High-ranking management never responded when it learned of the harassment. By saying "It is Mr. Kan's habit of using profanity, there is nothing the company could do to stop him" is just another way of telling Mr. Kan to keep harassing me. Lastly I was terminated for false reasons in an effort to cover up the real reasons of discrimination and to win the discrimination charge. Looking at the relevant factors and the context in which employer handled the harassment complaints, I am certain that the termination of my employment was constructive for the illegitimate motives rather than the business related reason.

My allegation to the NMT's illegitimate motives had something to do with an on going scam governed by a group of high-ranking professionals in Medical Device Industry. The motives for the scam to the best of my knowledge are the followings:

a) There has been an attempt behind my back by a group of professionals to force me into using my super dexterity to perform delicate assembly work that also requires high accuracy and details, particularly for the very delicate and hard-to-assemble medical products. My distinctive dexterity, high accuracy and details were discovered by ACT Medical, Inc. where I had worked for 8 years and where I had always been a pioneer for the most difficult projects or products that required these skills.

b) In order to achieve their goal behind my back they must find a way to contain me. One possible way was to find the weaknesses and the mistakes that I had made in my personal life by invasion of my privacy. Through my close observation for years, I am certain that they thoroughly invaded my privacy without my knowledge including but not limited to my school transcript, medical record, tax records, and interviews with neighbors, doctors, school professors etc. They discovered the weaknesses and mistakes I made in my personal life, although these mistakes would cause no harm to anyone but can be used to ridicule,

intimidation, inflicting emotional distress, and for the reasons to defend their illegal acts. Besides, they are also making attempt to put me at fault such as the recent harassment and constructive discharge of my employment at NMT is a typical example. I believe that it was one of the setups to turn me into a person with a history of violence.

It is a complicated issue for me to explain fully in detail these matters in several lines because of my limited of the English language and knowledge of the legal system. I hope that I will have an opportunity to explain myself and hopefully discover more facts about these matters under the justice system.

6) Should the employer will be found violating the discrimination laws, plaintiff demands judgment against the defendant for damages as followings:

   a) Reinstatement of employment if possible.
   b) Reimburse the wage lost based on the last rate at NMT Medical from the date of termination until the day before plaintiff starts new employment.
   c) The employer should compensate for plaintiff's emotional distress.

7) Plaintiff requests for a trial by jury.

Loi Tan Nguyen
92 Saint Marks Rd. #1
Dorchester, MA 02124
Tel.: 617 282 2756

*UMMC - Disability Evaluation Services*
*Dictated Report*

Name: NGUYEN, LOI
SS#: 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
DOB: 01/02/1956
Case #: 530648
MD Name: DEBRA ROSENBLUM, M.D.
Date of Exam: 06/21/2004

Loi Nguyen is a 48-year-old, Vietnamese male who arrives on time to the evaluation to which he has driven himself. The evaluation is slightly limited due to the language barrier, as it was felt at times that Mr. Nguyen did not completely understand all of the questions that were asked. Mr. Nguyen states that he has a longstanding history of sleep difficulty. He states that he first experienced this problem 20 years ago and states that, "The more I use my brain, the less I was able to sleep." He states that 20 years ago, he was admitted to the New England Medical Center for a two week psychiatric hospitalization. He states that he is not in psychiatric care at this time and is not seeing either a therapist or on psychiatric medication. He states that two or three years ago, he took an antidepressant medication, but does not remember it's name. The medication was prescribed by his primary care physician, Dr. Mucacci in Watertown, but he discontinued it because he did not find it to be helpful.

Mr. Nguyen states that he may sleep only three hours a night, from 2 am to 5 am. He states that although, he is not tired in the morning, he gets more tired as the day progresses. He states that he finds that he has more and more difficulty concentrating and remembering things as the day progresses. He states that he believes his short-term memory is impaired and that he cannot remember formulas that he needs to know for school. He states that he is "only able to use my brain in the morning." He states that when he is tired, he does not like to be around people. He denies any history of violence towards others or any homicidal ideation. He denies any history of suicidal ideation or suicide attempt. He states that he has a very good appetite and has gained 20 pounds in the past two to three years.

Mr. Nguyen states that he believes there is a group of people following him, wishing to invade his private life. He states that this group of people can air his private information personally and that he has heard them talking about his medical and school record. He states that he feels that they threaten him emotionally, although not physically. He states that at night, he often feels a gnawing inside his stomach. He said he is never frightened of leaving the house; although, sometimes feels that these people are following him and can feel them behind him. He denies any olfactory hallucinations. He denies any visual hallucinations. He denies any delusions of grander or ideas of reference.