# Exhibit 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **LOI TAN NGUYEN,** )<br><br>**Plaintiff** )<br><br>**v.** )<br><br>**NMT MEDICAL, INC.,** )<br><br>**Defendant.** ) | **Civil Action No. 04-CV-11781-DPW** |

## AFFIDAVIT OF CARA HARD

I, Cara Hard, under the pains and penalties of perjury, state:

1.      I make this affidavit in support of defendant NMT Medical, Inc.'s (the "Company" or "NMT") motion to dismiss plaintiff Loi Tan Nguyen's complaint filed on August 13, 2004. I have personal knowledge of the facts and matters stated herein.

2.      I am above the age of 18 and understand the nature of an oath.

3.      I am employed by NMT Medical, Inc. I was NMT's Human Resources Manager during the time of Mr. Nguyen's employment, and continue to be employed in this position.

4.      NMT, based in Boston, Massachusetts, designs, develops and markets proprietary implant technologies that allow cardiologists to treat cardiac sources of stroke. The Company's products are designed to offer alternative approaches to existing complex treatments, thereby reducing patient trauma, shortening hospitalization and recovery times, and lowering overall treatment costs.

5.      The Company is committed to equal employment opportunity and employs a diverse workforce of approximately 99 employees, of which 66% are Caucasian, 32% are Asian

(primarily of Cambodian and Vietnamese descent) and the remainder are Hispanic and African American.

6.      Mr. Nguyen began his employment at the Company on May 20, 2002 as a Senior Technician in the Company's Research and Development Department. In this position, Mr. Nguyen was responsible for performing laboratory based support for Research and Development projects and was supervised by Lee Core, a Senior Engineer in the Research and Development Department.

7.      At the time of Mr. Nguyen's employment, the Research and Development Department included fourteen employees, of which three were Asian.

8.      On or about July 31, 2002, I received an e-mail from Mr. Nguyen complaining that a co-worker, Senior Technician Kellywan Kan, was swearing in his cubicle. I immediately met with Mr. Nguyen, who told me that he was not sure whether Mr. Kan was directing the profanities at him. I told Mr. Nguyen that I would investigate the situation. I asked Mr. Kan's supervisor, Sean Forde, to meet with Mr. Kan and discuss Mr. Nguyen's concerns.

9.      On or about August 9, 2002, Mr. Nguyen told me and his supervisor, Lee Core, that his concerns had been addressed in a satisfactory manner and that the situation had improved.

10.      On May 28, 2003, Mr. Nguyen again spoke to me about his problems with Mr. Kan. Mr. Nguyen objected to Mr. Kan's continued use of obscenities in his cubicle, although he acknowledged that Mr. Kan never directed any profanities at him. Mr. Nguyen further stated that Mr. Kan made him feel uncomfortable. I asked Mr. Nguyen to explain specifically what Mr.

Kan was doing to make him uncomfortable, but Mr. Nguyen abruptly left my office, insisting that he would handle the situation himself.

11.    The Company took Mr. Nguyen's concerns seriously and took steps to investigate his complaint. As part of this investigation, I met with Mr. Nguyen's co-worker Blong Xiong on May 29, 2003, who indicated that he did not witness Mr. Kan cursing at, harassing, threatening or intimidating Mr. Nguyen in any way. Further, I asked Mr. Core to meet with Mr. Nguyen to ascertain why Mr. Nguyen felt uncomfortable around Mr. Kan. Mr. Core reported that he met with Mr. Nguyen on several occasions but that Mr. Nguyen stated only that Mr. Kan engaged in "abnormal" conversation, namely by saying "shhh" as Mr. Nguyen walked by his workspace and making sounds and gestures reflecting his frustrations. I also asked Mr. Forde to meet with Mr. Kan to discuss Mr. Nguyen's complaint. Further, no NMT employee ever reported hearing, seeing or perceiving Mr. Kan to be directing obscenities at Mr. Nguyen. Overall, the investigation did not reveal any information indicating that Mr. Nguyen's complaint had merit. However, the Company still wanted Mr. Nguyen to feel comfortable in his workplace and, therefore, drafted a memorandum of understanding that Mr. Nguyen and Mr. Kan signed on June 5, 2003. In this memorandum, NMT agreed to move Mr. Nguyen's workspace so that he would not be sitting next to Mr. Kan and Mr. Nguyen agreed to notify his supervisor if Mr. Kan conducted himself in a way that made Mr. Nguyen feel uncomfortable.

12.    On June 23, 2003, I learned that Mr. Nguyen and Mr. Kan had a confrontation. After the confrontation, Mr. Core and I tried to speak with Mr. Nguyen. Mr. Nguyen argued that his behavior was appropriate because Mr. Kan was making fun of him. Mr. Nguyen refused to discuss the matter with Mr. Core or me, except to deny saying anything to Mr. Kan that could be interpreted as a request to settle the dispute physically. He then left to call the police and lodge a

complaint against Mr. Kan. Shortly thereafter, the Boston Police Department arrived at NMT and interviewed Mr. Nguyen and me. When Mr. Nguyen was unable to identify any action taken against him by Mr. Kan, the police stated that they could do nothing but file a report of his complaints. I told Mr. Nguyen that he should go home and that he should not report to work until after we investigated the day's incidents.

13.    Over the several days following June 23, 2003, I completed a thorough investigation of the incident involving Mr. Nguyen and Mr. Kan, interviewing all the witnesses to the event. On June 23, 2003, Mr. Forde provided me with a written statement regarding the incident, in which he stated that Mr. Xiong had alerted him and Mr. Core to the incident. Mr. Forde reported that when he entered the laboratory, Mr. Nguyen was speaking in an angry, raised voice, gesturing past Mr. Chanduszko, directing aggression toward Mr. Kan and telling Mr. Kan that he wanted him to go outside. Mr. Forde reported that Mr. Kan was trying to explain to Mr. Nguyen that he was not talking about him. Mr. Forde also reported that he asked Mr. Kan to return to his office area, which Mr. Kan did. Mr. Forde stated that he then asked Mr. Nguyen to report to his office area, but that Mr. Nguyen continued behaving aggressively, stating "Let's go outside, I want to go outside." Mr. Forde reported that when he again asked Mr. Nguyen to return to his work area and stop his aggression, Mr. Nguyen began to argue and said that he did not have to stop and could say whatever he wanted to say. Mr. Forde stated that he repeated his request for Mr. Nguyen to return to his work area two additional times and that Mr. Nguyen remained defiant. Mr. Forde reported that Mr. Core then took Mr. Nguyen to a private area. I found Mr. Forde's report of this incident to be credible.

14.    As part of the investigation, I spoke with Mr. Chanduszko, Mr. Core, Mr. Kan, Mr. Xiong, John Wright (Director of Research and Development) and Carol Ryan (Vice

President of Research and Development). Mr. Chanduszko informed me that he and Mr. Kan had been joking with each other when Mr. Nguyen abruptly approached and yelled that Mr. Kan should stop making fun of him. Mr. Chanduszko also reported that Mr. Nguyen asked Mr. Kan if he wanted to "take this outside" and repeatedly asked Mr. Kan if he wanted to settle the issue outside. Mr. Core reported that, when Mr. Xiong brought him to Mr. Nguyen and Mr. Kan, Mr. Nguyen was yelling and aggressively gesturing to Mr. Kan, saying "Let's go outside. You want to go outside?" He confirmed that, when Mr. Forde asked Mr. Nguyen and Mr. Kan to return to their work areas, Mr. Nguyen did not comply and instead yelled at Mr. Kan, implying that he wanted to fight outside. Mr. Core also reported that he then escorted Mr. Nguyen away from Mr. Kan but that Mr. Nguyen remained defiant and tried to break away. Mr. Kan reported that Mr. Nguyen raised his voice to him from across the room then came over to him, acting angry and aggressive. Mr. Kan stated that he tried to explain that he was not talking about or laughing at Mr. Nguyen but that Mr. Nguyen continued to aggressively gesture and say something to him about going outside. Mr. Kan reported that he was afraid of Mr. Nguyen. Mr. Xiong reported that he saw Mr. Nguyen run up to Mr. Kan and heard him ask Mr. Kan why he was laughing at Mr. Nguyen. Mr. Xiong reported that Mr. Chanduszko tried to explain that he and Mr. Kan were not talking about Mr. Nguyen and stood between Mr. Nguyen and Mr. Kan, attempting to direct Mr. Nguyen back to his work area. Mr. Xiong reported that he then left to get Mr. Core and Mr. Forde and that when he returned, Mr. Nguyen was walking back and forth and loudly repeating "Let's go outside. You want to go outside?" to Mr. Kan. Mr. Xiong reported that Mr. Core then took Mr. Nguyen out of the lab area. Mr. Wright and Ms. Ryan also both reported hearing Mr. Nguyen yell at and threaten Mr. Kan. I found these witnesses's accounts of the incident credible and believed that Mr. Nguyen had behaved inappropriately, yelling at and threatening Mr. Kan.

15.    On June 25, 2003, NMT's Chief Financial Officer and Vice President Rick Davis and I ended our investigation with a telephone call to Mr. Nguyen. During the call, Mr. Nguyen defended his actions, arguing that Mr. Forde had no right to tell him to stop talking to Mr. Kan and that, even if he had threatened Mr. Kan, his response was appropriate because he was reacting to perceived harassment. In light of the investigation results, compounded by Mr. Nguyen's attempt to justify his behavior, we believed that Mr. Nguyen posed a safety risk to Mr. Kan and our other employees.

16.    On June 26, 2003, we informed Mr. Nguyen that we had decided to terminate his employment due to his threats against a co-worker.

17.    At no time during Mr. Nguyen's employment did he complain that he was being discriminated against or harassed based on his race and/or national origin.

18.    At no time during Mr. Nguyen's employment did NMT invade his privacy or obtain details regarding Mr. Nguyen's school record, medical record or daily activities, except to the extent disclosed by Mr. Nguyen. Further, at no time during Mr. Nguyen's employment did he ever complain to NMT about an alleged invasion of privacy.

19.    Following his termination from employment with NMT, Mr. Nguyen filed a charge of discrimination against NMT with the Equal Employment Opportunity Commission (the "EEOC") on March 29, 2004, claiming that NMT's decision to end his employment was based on his race and national origin and violated Title VII of the Civil Rights Act of 1964 and M.G.L. c. 151B. On May 21, 2004, the EEOC issued a determination dismissing Mr. Nguyen's claim and stating that, based upon its investigation, it was unable to conclude that Mr. Nguyen's charge established a violation of Title VII or Chapter 151B. Similarly, the MCAD issued a lack of probable cause finding on June 9, 2004. Mr. Nguyen then appealed the MCAD's dismissal of

his complaint. On August 26, 2004, the MCAD held a hearing to consider Mr. Nguyen's appeal of the lack of probable cause finding. On September 9, 2004, the MCAD issued a determination affirming the lack of probable cause finding and stating that Mr. Nguyen failed to establish sufficient evidence to determine that NMT committed an unlawful act of discrimination. Mr. Nguyen subsequently filed his claim in federal court on August 13, 2004.

20.    A caliper is a small measuring tool used regularly by engineers at NMT.

Signed under the pains and penalties of perjury this 2nd day of August, 2006.

_____

Cara Hard

# Exhibit 2

1

UNITED STATES DISTRICT COURT    CERTIFIED ORIGINAL
                                 LEGALINK BOSTON
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-11781-DPW

************************************

LOI TAN NGUYEN,

                    Plaintiff,

        v.

NMT MEDICAL, INC.,

                    Defendant.

************************************

                    DEPOSITION OF LOI TAN NGUYEN, a

witness called on behalf of the Defendant, taken

pursuant to the Federal Rules of Civil

Procedure, before Maureen O'Connor Pollard, RPR,

CLR, and Notary Public within and for the

Commonwealth of Massachusetts, at the offices of

Wilmer, Cutler, Pickering, Hale and Dorr, LLP,

60 State Street, Boston, Massachusetts, on the

17th of May, 2006, commencing at 10:10 o'clock

a.m.

Loi Tan Nguyen
05/17/2006

2

1    APPEARANCES:

2    FOR THE PLAINTIFF:

3         BY:   LOI TAN NGUYEN, Pro Se

4               92 St. Mark's Road

5               Dorchester, Massachusetts 02124

6               617-282-2756

7

8    FOR THE DEFENDANT:

9         BY:   JULIE MURPHY CLINTON, ESQ.

10              WILMER, CUTLER, PICKERING, HALE

11               And DORR, LLP

12              60 State Street

13              Boston, Massachusetts 02109

14              617-526-6000

15              julie.clinton@wilmerhale.com

16

17

18

19

20

21

22

23

24

18

1       Q.     When did you start working for NMT?

2       A.     I believe it's May 20th or May 2nd.

3       Q.     In 2002?

4       A.     In 2002.

5       Q.     Okay.  And what was your position when

6  you were hired there?

7       A.     It's engineering technician.

8       Q.     Who did you interview with for that

9  job at NMT?

10      A.     I interviewed with Lee Core, my

11  immediate supervisor.  L-E-E, C-O-R-E.

12             And John, I believe he -- at that time

13  his position at NMT Medical is engineering

14  director, something like that.

15      Q.     John Wright?

16      A.     John Wright.

17      Q.     And who hired you for the position?

18      A.     On the offer letter it's not Lee's

19  signature.  I believe Cara Hard.  I'm not sure

20  of the answer, but I believe Cara Hard sign the

21  offer letter.

22      Q.     When you started working at NMT, who

23  did you report to?

24      A.     Directly to Lee Core.

24

1    That's what he say, that's what he say, very

2    loud, very loud.

3        **Q.    Okay.**

4        A.    And secondly he tried to avoid to talk

5    to me, like any time he know me to come to the

6    place, he talking with the other worker, he go

7    away, he left, he leave.

8        **Q.    So when did he start swearing more**

9    **loudly in his cubicle?**

10       A.    About two weeks later, two weeks later

11   he started to do that, he started to do that.

12       **Q.    And just to make sure I understood, so**

13   **it was louder and longer?**

14       A.    Longer, and more often.

15       **Q.    What made you think he was directing**

16   **those words at you?**

17       A.    The reason is because his weird

18   personality with me.  Secondly, he say that

19   under circumstance that there is no reason for

20   him to say any profanity.  Because he only say

21   profanity in his cubicle, and every time he know

22   I'm in my cubicle, then he come to say profanity

23   for five minutes, ten minutes, and then he left,

24   he go back to his work station, never say one

Loi Tan Nguyen                                           05/17/2006

25

1    word about profanity.

2        Q.    So he would only swear in his own

3    cubicle?

4        A.    Yes.

5        Q.    Could it have possibly been that he

6    was just frustrated with work when he was

7    swearing?

8        A.    I don't believe he the type of people

9    who swear often.

10       Q.    But is it possible that he was just

11   frustrated?

12       A.    I don't think it's possible.

13       Q.    Why don't you think that's possible?

14       A.    Because if he swear because he's

15   frustrated, something, then he can swear

16   anywhere at any time at any location.  He only

17   swear in his cubicle.  It had the intention

18   there, a purpose.

19            For example, like he frustrated with

20   his work, then he should swear, say profanity at

21   his work station, he doesn't do that, he didn't

22   do that, he come to the cubicle, he say

23   profanity.

24       Q.    Was his work station in a public area?

Loi Tan Nguyen                                              05/17/2006

31

1    now.

2         Q.    Do you recall telling Mr. Core that

3    you were satisfied and that your concerns had

4    been addressed?

5         A.    No.

6         Q.    You don't remember having that

7    conversation?

8         A.    I never, I never -- I don't think I

9    told him anything like that.

10        Q.    Did Mr. Core ask you after that if

11   things were okay at work?

12        A.    I don't remember anything like that.

13        Q.    Okay.  So you don't remember if Mr.

14   Core asked you if things were okay?

15        A.    No, because when they talked to me, it

16   seemed that's all they said.

17        Q.    So you don't recall telling Mr. Core

18   that the situation had been addressed and that

19   it was okay?

20        A.    No.

21        Q.    Okay.  Did you complain to Mr. Core

22   again after that?

23        A.    After that, because he come to me to

24   say profanity, and I believe it's more and more

52

1      A.    I tell them Kellywan, Kellywan direct

2    profanity, and on one occasion he intimidate me

3    using the -- a tool, measurement tool, he walked

4    back and forth and he shake his hand like that,

5    he go back and forth.  And then about an hour

6    later I heard two co-op, Derek and the other

7    co-op student, I don't remember, but I remember

8    only Derek, they talk together in the hallway,

9    they say "oh, you know, Kellywan tried to

10   intimidate him with the caliper."

11      Q.    So what is a caliper?

12      A.    Caliper is the measurement device, and

13   at one end very sharp.

14      Q.    And what exactly did Kellywan do with

15   the caliper?

16      A.    Oh, he hold the caliper, and he walk

17   like the lab.  The testing instrument is next to

18   the exit door.

19      Q.    Can you repeat that for me?  I'm not

20   sure I understand.

21      A.    I mentioned with the police at one

22   occasion Kellywan to intimidate me with the

23   sharp device.

24      Q.    When did that happen?

Loi Tan Nguyen                                          05/17/2006

53

1       A.    It happened before the last incident.

2       **Q.    Before May 28th, 2003?**

3       A.    Yes, yes.  But I never report that to

4    the human resource and supervisor.

5       **Q.    Why didn't you report that?**

6       A.    Because I report -- I complain too

7    many times, and they are not helping, there are

8    no resolutions, there are no remedies, so I'm

9    just tired of complaining, so I don't want to.

10      **Q.    Okay.  So on that day with the**

11   **incident with Kellywan, what did Kellywan do**

12   **with the caliper?**

13      A.    No.  The caliper incident, it happened

14   long before.

15      **Q.    Right.  But when it happened, what did**

16   **Kellywan do?**

17      A.    He hold the caliper, when I work on

18   the instrument it's right at the door that go in

19   and out of the lab, and he go in the lab also

20   but on the other side, so he go back and forth

21   with the tight fist with the caliper in his

22   hand, and he go back with the gesture from his

23   face, back and forth like three, four times like

24   that.

Loi Tan Nguyen                                              05/17/2006

54

1      Q.    Okay.   Let me just see if I

2   understand.

3           So Kellywan was in the lab and you

4   were walking by the door to the lab?

5      A.    No.   We working in the same lab.

6      Q.    Okay.

7      A.    It's the same room.

8      Q.    Okay.

9      A.    I work at the instrument right at the

10  exit door.

11     Q.    Okay.   So you're working right at the

12  exit door?

13     A.    Yes.

14     Q.    Kellywan is somewhere else in the

15  room?

16     A.    In the room on the other side.

17     Q.    Okay.

18     A.    And he go back and forth holding the

19  caliper.   The caliper is a device, have a sharp

20  end on the other side, and he walk back and

21  forth, he just walk back and forth.   And I know,

22  I know he tried to intimidate, like tried to

23  scare me, something like that.   I know that

24  because the way he walked, the way he hold the

Loi Tan Nguyen                                    05/17/2006

55

1    caliper.

2         Q.   So Kellywan was walking back and forth

3    while holding the caliper?

4         A.   Yes.

5         Q.   Did he gesture towards you with the

6    caliper?

7         A.   No.  Gesture, yes, but he just

8    gesture.  By the way he holding it and the

9    expression from his face and the way he walked,

10   and he walked back and forth without a reason.

11             So I confirmed that by overheard the

12   two co-op students about one hour later in the

13   hallway, Derek and the other co-op student, they

14   talking about Kellywan tried to intimidate, to

15   scare me with the caliper.  And I, in the lab, I

16   heard, I heard they talking about that.  But I

17   don't -- I say he just tried to intimidate, I

18   didn't talk to the manager.  Because

19   secondly --

20        Q.   Did Kellywan actually say anything to

21   you when he was walking back and forth with the

22   caliper?

23        A.   No.

24        Q.   Did you feel threatened at that time?

Loi Tan Nguyen                                          05/17/2006

56

1      A.   Yes.

2      Q.   Okay.  Just going back to the police

3  report then, so you told the police about that

4  incident?

5      A.   Yes.

6      Q.   And about the incident that was

7  happening on that day, June 23rd?

8      A.   On that day, right.

9      Q.   Okay.  And what was the police's

10  response?

11      A.   Because Kellywan already go home, so

12  they -- officer cannot interview with Kellywan,

13  and all -- they have the report and they write

14  out what I tell them.  That's all.

15      Q.   And then what happened?

16      A.   And then Lee took me outside, after

17  that Lee took me outside and he told me that

18  "you go home and don't come back until you hear

19  from me."

20      Q.   Did he tell you that NMT was going to

21  investigate what happened?

22      A.   No.

23      Q.   Okay.  Do you remember telling Miss

24  Hard or Mr. Core that you felt your behavior was

1      A.    Yes.

2      Q.    In paragraph three of your complaint

3   you state that NMT instigated Mr. Kan to harass

4   you with profanities and intimidate you with a

5   sharp device.

6            What did NMT do to instigate Mr. Kan?

7      A.    That's what I believe from

8   circumstantial evidence.

9      Q.    Do you have any evidence that NMT

10  instigated Mr. Kan?

11     A.    I don't have direct evidence, but from

12  the circumstantial evidence I believe he

13  instigate it.

14     Q.    What circumstantial evidence do you

15  have that makes you believe that?

16     A.    First of all, we had strange

17  relationship without reason very early from the

18  first day I start to work for the NMT Medical.

19            And also I'm not isolated from Mr.

20  Kellywan, but also from other workers, too,

21  because there was a strange relationship, not

22  only with Kellywan, but also from other workers.

23  They don't seem to be very friendly in talking

24  or have a willing talking, and I don't know

Loi Tan Nguyen                                          05/17/2006

62

1  where it come from, but I believe there is a

2  strange relationship between me and other

3  co-workers.

4          And more of that, after my repeated

5  complaint to the manager, I don't think -- I

6  don't see anything happen.  Every time I

7  complain to them they just say "it's his habit

8  of saying obscenity, there's nothing we can do

9  now."  And I think that answer is very strange

10  because I believe the company is liable to do a

11  thorough investigation to its co-worker, too,

12  and I don't believe they ever do the

13  investigation.

14          Q.  Is there someone in particular at NMT

15  that you believe instigated Mr. Kan?

16          A.  I believe it's from his supervisor,

17  directly from.  It doesn't have to be true, but

18  because the relationship, I do believe Kellywan

19  is directly instigated by his supervisor.

20          Q.  Do you have any reason for that

21  belief?

22          A.  No.  The reason is in general, as I

23  said, from the circumstantial evidence I believe

24  he's instigated.

Loi Tan Nguyen                                    05/17/2006

65

1   between the way they handle the harassment and

2   it end up with a termination, all that, there is

3   an inference of race discrimination.

4       **Q.    So do you have any evidence that**

5   **anything NMT or Mr. Kan did was based in any way**

6   **on your race or national origin?**

7       A.   I don't have direct evidence.  But

8   from the circumstantial evidence, I believe

9   there inference of discrimination.

10      **Q.    What makes you believe that they were**

11  **discriminating against you based on your race or**

12  **national origin?**

13      A.   Because if it happened to someone else

14  exactly or similar to this same situation, they

15  will handle the harassment, they will do

16  completely different.

17      **Q.    How do you know that?**

18      A.   There no one do the investigation like

19  that.

20      **Q.    Has anyone else had a similar**

21  **situation that you know of?**

22      A.   I don't know.  I don't know.

23      **Q.    So you don't know of any other**

24  **situation at NMT where someone of a different**

Loi Tan Nguyen                                    05/17/2006

87

1      Q.    Do you --

2      A.    And I also believe that the way

3  Kellywan harassment can be, can be a -- it

4  caused a way for the company to move me to the

5  production.  Because if I keep complaining to

6  them, if I keep complaining to them, one day

7  they going to say "why don't we relocate you to

8  the manufacturing department?"  Because

9  engineering department is second floor, first

10 floor is the manufacturing, if they move me to

11 the first floor there are no more harassment.

12 And I believe that that is -- that's the pretext

13 for that.

14     Q.    But you, just to confirm, you have no

15 evidence --

16     A.    No.

17     Q.    -- of this?

18     A.    I don't.

19     Q.    Okay.  And do you have any evidence

20 that NMT invaded your privacy?

21     A.    No, I don't.

22     Q.    Going back to prior complaints that

23 you filed with employers.

24     A.    Yes.

Loi Tan Nguyen                                    05/17/2006

100

1    race or national origin and not other members of

2    minority groups at work.  If you don't know,

3    it's okay to say you don't know.  But if you

4    have a reason, you have to tell me.

5         A.    The answer is that -- I do believe NMT

6    is motivated -- is motivating factor of the

7    discrimination because it's consistently I have

8    to work under diverse employment action.

9         Q.    Why do you believe your race or

10   national origin were the motivating factor?

11        A.    By definition, by definition if I'm a

12   minority and if I have to go through a prolonged

13   adverse employment action, by definition it's

14   discrimination.

15        Q.    You understand that Kellywan Kan is

16   also Asian and of Cambodian descent?  I know

17   you're not of Cambodian descent, but Mr. Kan is

18   also Asian and of a national origin that is

19   Cambodian, correct?

20        A.    Yes.

21        Q.    So why do you believe that NMT would

22   treat him differently than you?

23        A.    I don't know.  That's what I don't

24   know.  I don't know.  He's Cambodian.  It

Loi Tan Nguyen                                      05/17/2006

101

 1   doesn't mean -- it doesn't mean that the NMT did

 2   not discriminate against me because it's just a

 3   pretext or a disguise.

 4        Q.   **Do you think that NMT treated you**

 5   **different than any employee of a different race**

 6   **or national origin?**

 7        A.   Yes, they treated me differently.

 8        Q.   **Why do you think that?**

 9        A.   Because you look at the way they

10   handled the investigation, it's the intention.

11        Q.   **Do you know of any investigation they**

12   **did of someone of a different race or national**

13   **origin background?**

14        A.   No.  But I think they are liable to

15   the law to do the thorough investigation,

16   objective investigation, and they should be

17   discovering the harassment.

18        Q.   **Okay.  Just to clarify, no one at NMT,**

19   **though, ever mentioned your race or national**

20   **origin to you?**

21        A.   I don't hear anything about that.

22        Q.   **And Mr. Kan never mentioned your race**

23   **or national origin to you?**

24        A.   No.

Loi Tan Nguyen                                              05/17/2006

102

1     Q.    Neither NMT nor Mr. Kan ever said

2  anything to you about your race or national

3  origin?

4     A.    I never heard that.

5     Q.    Okay.  I just want to ask you some

6  questions about your unemployment and job

7  search.

8     A.    Yes.

9     Q.    How long were you unemployed for after

10  working for NMT?

11     A.    It's more than a year.  Like I start

12  working for NMT Medical on June 26th, and I got

13  the new job on September 2nd or 9th of the

14  following year.

15     Q.    Did you collect unemployment

16  compensation?

17     A.    Yes.

18     Q.    Do you remember when you started

19  collecting unemployment compensation?

20     A.    Two weeks later.

21     Q.    Okay.  Why did it take you two weeks?

22     A.    Oh, because I had to do the paperwork,

23  I had to call them, I had to do the paperwork.

24     Q.    And how long did you collect

# Exhibit 3

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **LOI TAN NGUYEN,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| **v.** ) | **Civil Action No. 04-CV-11781-DPW** |
| ) | |
| **NMT MEDICAL, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### AFFIDAVIT OF SEAN FORDE

I, Sean Forde, under the pains and penalties of perjury, state:

1.      I make this affidavit in support of defendant NMT Medical Inc.'s (the "Company" or "NMT") motion to dismiss plaintiff Loi Tan Nguyen's complaint filed on August 13, 2004. I have personal knowledge of the facts and matters stated herein.

2.      I am above the age of 18 and understand the nature of an oath.

3.      I am employed by NMT Medical, Inc. as a Research and Development Engineer and was Kellywan Kan's supervisor during the time of Mr. Nguyen's employment. Mr. Kan was and continues to be employed as a Senior Technician and is Asian and of Cambodian descent.

4.      On or about August 1, 2002, I met with Mr. Kan regarding Mr. Nguyen's complaint to Cara Hard, the Company's Human Resources Manager, regarding Mr. Kan's use of profanities while in his cubicle. Mr. Kan admitted that he occasionally swore in his cubicle, but stated that his swearing was in no way directed at Mr. Nguyen. I instructed Mr. Kan to cease using profanities in the workplace.

5.    On or about May 29, 2003, Ms. Hard informed me that Mr. Nguyen had again complained that Mr. Kan continued to use obscenities in his cubicle and made him feel uncomfortable.  I met with Mr. Kan to discuss Mr. Nguyen's complaint, and Mr. Kan admitted to occasionally using an obscenity in his cubicle.  Mr. Kan indicated to me that he would not swear in his cubicle.

6.    On June 23, 2003, Blong Xiong came to get me, and brought me and Lee Core, Mr. Nguyen's supervisor, to the area around Mr. Kan's cubicle.  There I saw Mr. Nguyen pacing, yelling and aggressively gesturing to Mr. Kan.  Mr. Nguyen yelled, "Let's go outside.  You want to go outside?"  I asked Mr. Kan and Mr. Nguyen to return to their work areas.  Mr. Kan complied, but Mr. Nguyen turned around and began yelling at Mr. Kan, implying that he wanted to fight outside.  I instructed Mr. Nguyen to stop his behavior, but Mr. Nguyen refused.  Mr. Core then escorted Mr. Nguyen away from Mr. Kan, but Mr. Nguyen remained defiant and tried to break away from him.

Signed under the pains and penalties of perjury this 2ⁿᵈ day of August, 2006.

_____
Sean Forde

# Exhibit 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LOI TAN NGUYEN, ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| v. ) | **Civil Action No. 04-CV-11781-DPW** |
| ) | |
| NMT MEDICAL, INC., ) | |
| ) | |
| **Defendant.** ) | |

### AFFIDAVIT OF KELLYWAN KAN

I, Kellywan Kan, under the pains and penalties of perjury, state:

1.     I make this affidavit in support of defendant NMT Medical, Inc.'s (the "Company" or "NMT") motion to dismiss plaintiff Loi Tan Nguyen's complaint filed on August 13, 2004.  I have personal knowledge of the facts and matters stated herein.

2.     I am above the age of 18 and understand the nature of an oath.

3.     I am employed by NMT Medical, Inc. as a Senior Technician.  I am Asian and of Cambodian descent.

4.     On or about August 1, 2002, my supervisor Sean Forde met with me to discuss a complaint by Mr. Nguyen regarding my use of profanities in my cubicle.  I admitted that I occasionally swore in my cubicle but assured Mr. Forde that my words were in no way directed at Mr. Nguyen.  Mr. Forde instructed me to cease using profanities in the workplace.

5.     In late May of 2003, I again met with Mr. Forde regarding another complaint made by Mr. Nguyen regarding my use of profanity in my cubicle.  I told Mr. Forde that I occasionally swore in my cubicle but that I would stop.

6.    On June 23, 2003, I was joking with a co-worker, Andrzej Chanduszko, when Mr. Nguyen raised his voice at me from across the room and then came over to me, acting angry and aggressive. I tried to explain to Mr. Nguyen that I was not talking about him or laughing at him, but he continued to aggressively gesture and say something to me about going outside. I was afraid of Mr. Nguyen.

Signed under the pains and penalties of perjury this 28 day of August, 2006.

_____
Kellywan Kan

# Exhibit 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LOI TAN NGUYEN,

Plaintiff,

v.                                          Civil Action No. 04-CV-10130-RCL

NMT MEDICAL, INC,

Defendants.

## AFFIDAVIT OF LEE CORE

I, Lee Core, under the pains and penalties of perjury, state:

1.      I make this affidavit in support of defendant NMT Medical Inc.'s (the "Company" or "NMT") motion to dismiss plaintiff Loi Tan Nguyen's complaint filed on August 13, 2004. I have personal knowledge of the facts and matters stated herein.

2.      I am above the age of 18 and understand the nature of an oath.

3.      I was employed by NMT Medical, Inc. as a Senior Engineer and was Mr. Nguyen's supervisor during the time of his employment.

4.      In his capacity as a Senior Technician in the Research and Development Department, Mr. Nguyen was responsible for performing laboratory-based support for Research and Development projects.

5.      At the time of Mr. Nguyen's employment, the Research and Development Department included fourteen employees, of which three were Asian.

6.    On or about July 31, 2002, Cara Hard, NMT's Human Resources Manager, informed me that Mr. Nguyen had complained about the behavior of his co-worker, Kellywan Kan. On or about August 1, 2002, I spoke with Mr. Nguyen regarding his complaint and he told me that he felt there might be an issue with Mr. Kan because he noticed a change with Mr. Kan and Mr. Kan no longer talks to him or says goodbye at the end of the day. Mr. Nguyen also said he felt uncomfortable because Mr. Kan swears near him.

7.    On or about August 9, 2002, Mr. Nguyen told me that his concerns regarding Mr. Kan had been addressed in a satisfactory manner and that the situation had improved. I told Mr. Nguyen that he should come to me with any concerns in the future.

8.    On or about May 28, 2003, Ms. Hard informed me that Mr. Nguyen had again complained about Mr. Kan, objecting to Mr. Kan's continued use of obscenities in his cubicle. I met with Mr. Nguyen several times to ascertain why he felt uncomfortable around Mr. Kan. Mr. Nguyen stated only that Mr. Kan engaged in "abnormal" conversation, namely by (1) saying "shhh" as Mr. Nguyen walked by his workspace and (2) making sounds and gestures reflecting his frustration.

9.    On June 23, 2003, Blong Xiong came to get me and brought me along with Sean Forde, Mr. Kan's supervisor, to the area around Mr. Kan's cubicle. There I saw Mr. Nguyen pacing, yelling and aggressively gesturing to Mr. Kan. Mr. Nguyen yelled, "Let's go outside. You want to go outside?" Mr. Forde asked Mr. Kan and Mr. Nguyen to return to their work areas. Mr. Kan complied, but Mr. Nguyen turned around and began yelling at Mr. Kan, implying that he wanted to fight outside. Mr. Forde instructed Mr. Nguyen to stop his behavior, but Mr. Nguyen refused. I then escorted Mr. Nguyen away from Mr. Kan, but Mr. Nguyen remained defiant and tried to break away from me.

10.    After the confrontation, Cara Hard and I tried to speak to Mr. Nguyen. Mr.

Nguyen argued that his behavior was appropriate because Mr. Kan was making fun of him. Mr.

Nguyen refused to discuss the matter with Ms. Hard or me. He then left to call the police and

lodge a complaint against Mr. Kan.

Signed under the pains and penalties of perjury this 22nd day of August, 2006.

_Lee A. Core_

Lee Core

# Exhibit 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LOI TAN NGUYEN, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )    **Civil Action No. 04-CV-11781-DPW** |
| | ) |
| NMT MEDICAL, INC., | ) |
| | ) |
| Defendant. | ) |

## AFFIDAVIT OF BLONG XIONG

I, Blong Xiong, under the pains and penalties of perjury, state:

1.     I make this affidavit in support of defendant NMT Medical, Inc.'s (the "Company" or "NMT") motion to dismiss plaintiff Loi Tan Nguyen's complaint filed on August 13, 2004. I have personal knowledge of the facts and matters stated herein.

2.     I am above the age of 18 and understand the nature of an oath.

3.     I am employed by NMT Medical, Inc. as a Senior Technician. I am Asian and of Laotian descent.

4.     In August of 2002, the Company investigated a complaint by Mr. Nguyen and I stated that I never heard Kellywan Kan make noises or curse at Mr. Nguyen, nor did I observe Mr. Kan harassing Mr. Nguyen in any way.

5.     On June 23, 2003, I became aware of a commotion near Mr. Kan's cubicle. Mr. Nguyen was aggressively gesturing at Mr. Kan. Mr. Nguyen told Mr. Kan that he wanted to go outside. Mr. Chanduszko stood between the two men, as Mr. Nguyen continued to yell at Mr.

Kan. At this point I ran to get Sean Forde, Mr. Kan's supervisor, and Lee Core, Mr. Nguyen's supervisor.

6.    When I returned with Mr. Forde and Mr. Core, Mr. Nguyen was pacing, yelling and aggressively gesturing to Mr. Kan. Mr. Nguyen yelled, "Let's go outside. You want to go outside?" Mr. Forde asked Mr. Kan and Mr. Nguyen to return to their work areas. Mr. Kan complied, but Mr. Nguyen turned around and began yelling at Mr. Kan, implying that he wanted to fight outside. Mr. Forde instructed Mr. Nguyen to stop his behavior, but Mr. Nguyen refused. Mr. Core then escorted Mr. Nguyen away from Mr. Kan, but Mr. Nguyen remained defiant and tried to break away from him.

Signed under the pains and penalties of perjury this _2_ day of August, 2006.

_____
Blong Xiong

# Exhibit 7



# Memo

**To:**     File

**From:**   Lee Core

**CC:**     Cara Hard, Carol Ryan

**Date:**   May 30, 2003

**Re:**     Agreement between Loi Tan Nguyen and Kellywan Kan

---

Based upon Loi's assertions that Kellywan Kan conducts himself in ways that makes Loi feel uncomfortable, and Kellywan's statement that he is not doing any activity intentionally toward Loi and is willing to discuss the problem, the following proposal is agreed upon by all parties signed herein.

- Should Kellywan conduct himself in ways that makes Loi uncomfortable, Loi agrees to immediately and professionally notify his supervisor in person, so his concerns are brought to management's attention.  Management agrees to follow through with appropriate action and address Kellywan with the issue.

- An agreement has been reached to move the location of Loi's workspace.  The purpose of this is to alleviate uncomfortable or unintentional interaction by changing proximity. This move will take place before June 16th, 2003.

- An additional recommendation has been made that Loi and Kellywan meet to settle their mis-understanding, but this can only be conducted when both persons are willing.

- The Supervisors agree to regularly follow-up with the Technicians to monitor activity and address any personal concerns.  Technicians are encouraged to approach their supervisor with any personal concerns at the time a problem arises.

_____  6/5/03    _____  6-5-03
Loi Tan Nguyen, Technician      Date    Kellywan Kan, Technician    Date

_____  6/5/03    _____  6/5/03
Lee Core, Supervisor      Date    Sean Forde, Supervisor      Date

PNMT 0060

# Exhibit 8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LOI TAN NGUYEN,

Plaintiff,

v.

NMT MEDICAL, INC.,

Defendant.

Civil Action No. 1:04-CV-11781-DPW

## AFFIDAVIT OF ANDRZEJ CHANDUSZKO

I, Andrzej Chanduszko, under the pains and penalties of perjury, state:

1.      I make this affidavit in support of defendant NMT Medical Inc.'s (the "Company" or "NMT") motion to dismiss plaintiff Loi Tan Nguyen's complaint filed on August 13, 2004.  I have personal knowledge of the facts and matters stated herein.

2.      I am above the age of 18 and understand the nature of an oath.

3.      I was employed by NMT Medical, Inc. as a Senior Engineer and worked with Mr. Nguyen during the time of his employment at NMT.

4.      On June 23, 2003, I was joking in a cubicle with Kellywan Kan.  Mr. Nguyen began yelling at Mr. Kan from across the room and stormed over to us to ask us why we were laughing at him.  We explained that we were not laughing at him.  Nevertheless, Mr. Nguyen began aggressively gesturing at Mr. Kan.  Mr. Nguyen told Mr. Kan that he wanted to go outside.  I stood between the two men, as Mr. Nguyen continued to yell at Mr. Kan.  Blong Xiong ran to get Sean Forde, Mr. Kan's supervisor, and Lee Core, Mr. Nguyen's supervisor.

5.    When Mr. Xiong returned with Mr. Forde and Mr. Core, Mr. Nguyen was pacing, yelling and aggressively gesturing to Mr. Kan. Mr. Nguyen yelled, "Let's go outside. You want to go outside?" Mr. Forde asked Mr. Kan and Mr. Nguyen to return to their work areas. Mr. Kan complied, but Mr. Nguyen turned around and began yelling at Mr. Kan, implying that he wanted to fight outside. Mr. Forde instructed Mr. Nguyen to stop his behavior, but Mr. Nguyen refused. Mr. Core then escorted Mr. Nguyen away from Mr. Kan, but Mr. Nguyen remained defiant and tried to break away from him.

Signed under the pains and penalties of perjury this  11  day of August, 2006.

_Andrzej Chanduszko_
Andrzej Chanduszko

# Exhibit 9

Printed by: **Cara B Hard**
Title: **Loi Tan Outburst, 6/23/03**

Wednesday, June 25, 2003  5:33:06 PM
Page 1 of 3

 Monday, June 23, 2003 6:56:10 PM
Message

From:  👤  Sean T. Forde

Subject:  Loi Tan Outburst, 6/23/03

To:  👤  Cara B. Hard

Cc:  👤  Carol A. Ryan
👤  John A. Wright

---

Log of events as witnessed by me, Sean Forde, employee of NMT Medical, Inc., just after 4:00 PM on Monday, 6/23/03.

Blong Xiong entered my office to inform me that there was an "...emergency in the Lab..." and consecutively entered Lee Core's office to repeat the same message.

Proceeding to the lab, I recognized an angry, raised voice, and confirmed it as Loi Tan Nguyen's, upon turning the corner to face the Lab. I proceeded into the Lab to see Kellywan Kan to my left, just outside of his office, who was facing the back of Andrzej Chanduszko, to my center, who, with his hand raised defensively, was facing Loi Tan Nguyen, to my right. It was obvious to me that Loi Tan was angry. Loi Tan was gesturing past Andrzej, directing aggression toward Kellywan Kan, telling him he wanted Kellywan to go outside. Kellywan Kan was attempting to explain to Loi Tan that he was not doing what Loi Tan had perceived, dialog to the effect of "...I was not doing that...".

I calmly, but promptly approached Kellywan, and asked him to discontinue his dialog and return to his office area. His first reaction was to attempt to explain the situation to me, at which time I interrupted him and reiterated my request, to which he then complied.

I then turned to Loi Tan, and asked him to do the same, return to his office area. Loi Tan initially seemed to comply, but then continued his aggression, requesting that Kellywan go outside, saying "Let's go outside, I want to go outside." I calmly suggested to Loi Tan that he stop his aggression and return to his office area. Loi Tan began to argue "I do not have to stop [this], I can [say] what I want", to which I calmly repeated my request two more times, and was met with consistent defiance.

PNMT 0095

It was at this time that Lee Core entered the Lab, and promptly left with Loi Tan to a private area, to discuss the matter.

I approached Kellywan and asked him to explain what had happened, to which he responded that he did not know why Loi Tan had responded in such a manner to him.

I asked Kellywan to recount the events that led to Loi's aggression. Kellywan explained having a conversation with Andrzej, about Andrzej being tired, and had asked if Andrzej was tired because he did not get enough sleep or because he was hungry. The conversation ultimately resulted in a mutual laughter between Kellywan and Andrzej, about the immediate conversation of Andrzej's sleepiness.

Kellywan recounted that it was at this time that Loi Tan raised his voice to Kellywan from across the room, and approached Kellywan and Andrzej, with anger and aggression. Kellywan recounted trying to explain that he had not directed anything toward Loi Tan, and that he had not laughed at Loi Tan. Kellywan recounted that this explanation did not mitigate Loi Tan's aggression, and that Loi Tan continued his aggression toward Kellywan.

As it was time for Kellywan to leave work for the evening, I walked he and Blong out of the building, and watched them both safely leave the area.

Lee Core and Loi Tan were outside of the building in the other direction, where I observed Loi Tan defiantly break away from conversation with Lee, who respectfully attempted to continue discussion with Loi Tan.

Sean Forde
R&D Engineer
NMT Medical, Inc.
27 Wormwood St.
Boston, MA. 02210

PH: 617-737-0930 ext.223
Fax: 617-737-0933

Printed by: **Cara B Hard**
Title: **Loi Tan Outburst, 6/23/03**

Wednesday, June 25, 2003  5:33:06 PM
Page 3 of 3

PNMT 0097

# Exhibit 10

EEOC Form 161 (3/98)                    U.S. _ AL EMPLOYMENT OPPORTUNITY COMM. N

# DISMISSAL AND NOTICE OF RIGHTS

| To: Loi Nguyen<br>92 Saint Marks Road Apt. #1<br>Dorchester, MA 02124 | From: **Boston Area Office**<br>John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |
|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR § 1601.7(a)) | |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 161-2004-00221 | **Susan M. Boscia,**<br>**Investigator** | **(617) 565-3213** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

## - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Robert L. Sanders,
**Director**

MAY 2 1 2004

(Date Mailed)

Enclosure(s)

cc: **NMT MEDICAL, INC.**
c/o Julie Murphy Clinton, Esq.
**Hale and Dorr LLP**
**60 State Street**
**Boston, MA 02109**

HALE AND DORR
FILE COPY

Enclosure with EEOC
Form 161 (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS --**   **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

## PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before 7/1/02 -- *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

## ATTORNEY REPRESENTATION -- Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

## ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

# Exhibit 11

The Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place, Room 601, Boston, MA 02108

SEP ᴜ 9 2004

Loi Nguyen
92 Saint Marks Road, Apt. #1
Dorchester,MA 02124

RE:  Loi Nguyen v. NMT Medical, Inc.
      MCAD DOCKET NO: 041301013

Dear Parties:

On August 26, 2004 a preliminary hearing was held regarding the above reference complaint to consider the Complainant's appeal of lack of probable cause finding issued in this Complaint on June 9, 2004.

Based upon information presented at the appeal hearing and a review of the evidence adduced in investigation, I have determined that the <u>Lack of Probable Cause</u> finding in this case is affirmed. This means that investigation and appeal evidence fails to establish sufficient evidence to determine that an unlawful act of discrimination has been committed.

All employment complaints where applicable, are dual filed with the U.S. Equal Employment Opportunity Commission (EEOC).  Our finding will be forwarded to its Area Office, JFK Federal Building, Boston, MA 02203. The MCAD finding will be given substantial weight by the EEOC provided that such finding are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and or The Americans with disabilities Act of 1990.

Very truly yours,

Walter J Sullivan, Jr.
Investigating Commissioner

cc: Julie Murphy Clinton, Esquire
    Hale & Dorr LLP
    60 State Street
    Boston, MA 02109

WILMER CUTLER PICKERING
HALE And DORR LLP
FILE COPY